# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PATRICK DAUGHERTY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0488-SG |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND EMPLOYEE RETENTION ASSETS LLC, HIGHLAND ERA MANAGEMENT LLC, and JAMES DONDERO, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HIGHLAND EMPLOYEE RETENTION ASSETS LLC, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 14, 2018
Date Decided: June 29, 2018

Thomas A. Uebler and Kerry Porter, of MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware, *Attorneys for Plaintiff*.

Michael F. Bonkowski and Nicholas J. Brannick, of COLE SCHOTZ P.C., Wilmington, Delaware; OF COUNSEL: Marc D. Katz and Crystal Woods, of DLA PIPER LLP (US), Philadelphia, Pennsylvania, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves litigation concerning a Delaware LLC, Highland Employee Retention Assets ("HERA"). HERA was created as a holding company, to encourage certain employees of Highland Capital Management, L.P. ("Highland Capital") to remain with the partnership. HERA was owned by these employees, and held incentive payments from Highland Capital. The Plaintiff, Patrick Daugherty, is one such employee, and he became the largest unitholder in HERA. HERA is controlled by the Defendants. In the fall of 2011, Daugherty left Highland Capital's employ.

Thereafter, the Defendants, including Highland Capital and its principal and affiliates, amended HERA's LLC Agreement in 2012, to include what amounts to an *in terrorem* clause. Any HERA unitholder who sued HERA or Highland Capital could be responsible for the entities' legal fees, and was subject to having contributions due him diverted from HERA and placed in escrow instead, until resolution of the dispute, and (presumably) satisfaction of the fees. The LLC Agreement was amended again in 2013, to remove a recitation that the purpose of HERA was to incentivize employment.

Highland Capital and Daugherty engaged in cross-litigation in Texas, starting in 2012, involving, in part, the legitimacy of these amendments. The Texas court restricted the jury's consideration to the 2012 amendment: the jury found a breach by the Highland Capital defendants of the implied covenant of good faith and fair

1

dealing in connection with the amendment, and awarded Daugherty $2.6 million against HERA, as a result; it also awarded Highland Capital $2.8 million from Daugherty for fees, however. That decision was affirmed on appeal. Meanwhile, Highland Capital bought out all of the unitholders in HERA, save Daugherty, leaving him the sole remaining individual equity holder. HERA's remaining assets were placed in escrow, but the agent resigned and paid the escrow fund, approximately $3.1 million, to Highland Capital, soon after the appellate court affirmed the judgment. Daugherty paid the Texas judgment; HERA has not.

In 2017, Daugherty brought this action, with three sets of claims. First, he argues that the transfer of the funds from escrow to Highland Capital involves a fraudulent transfer, designed to prevent him from collecting on the Texas judgment. Next, he brings claims based on several theories arising out of the 2013 amendment to the LLC Agreement and contemporaneous actions of the Defendants. Finally, he seeks indemnification from Highland Capital for litigation expense in Texas (as well as fees on fees).

The Defendants have moved to dismiss. I have already, by Letter Opinion, denied the motion with respect to the fraudulent conveyance claim. I address the balance of the motion below. I find claims based on the 2013 amendment barred by laches. The indemnification claim must proceed, however. My reasoning follows.

# I. BACKGROUND[1]

*A. The Parties and Relevant Non-Parties*

Plaintiff Patrick Daugherty was a partner and senior executive of Defendant Highland Capital and certain of its affiliates from 1998 until his resignation in 2011.[2] Daugherty resides in Dallas, Texas.[3]

Defendant Highland Capital is a Delaware limited partnership with a principal place of business in Dallas, Texas.[4] Highland Capital claims to have nearly $15 billion of assets under management and is an SEC-registered investment advisor.[5]

Defendant James Dondero is the president and co-founder of Highland Capital.[6] Dondero and co-founder Mark Okada, along with their affiliates and various personal and family trusts, control Highland Capital.[7]

Defendant and Nominal Defendant HERA was formed on June 23, 2009 as a Delaware limited liability company.[8] According to its LLC Agreement, HERA was

---

[1] The facts, drawn from the Verified Complaint (the "Complaint" or the "Compl.") and from documents incorporated by reference therein, are presumed true for purposes of evaluating the Defendants' Motion to Dismiss. *See, e.g.*, *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[2] Compl. ¶ 10.

[3] *Id.*

[4] *Id.* ¶ 11.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.* ¶ 12.

created as a holding company for incentive and retention payments to Highland Capital employees.[9] Pursuant to his previous employment at Highland Capital, Daugherty became a member of HERA and its largest unitholder.[10]

Defendant Highland ERA Management LLC ("HERA Management") is a Delaware limited liability company.[11] Dondero is the president and sole member of HERA Management.[12] According to the Plaintiff, HERA Management is "a mere instrumentality and Dondero's alter ago."[13]

*B. Factual Overview*

1. Daugherty Leaves Highland Capital

Highland Capital struggled during the 2008–09 financial crisis and created HERA "to curb employee resignations by offering employees a replacement of their previously received deferred compensation."[14] HERA granted employees "equity-like awards in certain funds" and then distributed the proceeds of those interests to its unitholders.[15] As an employee of Highland Capital, Daugherty became a director

---

[9] *Id.* ¶¶ 15–18.
[10] *Id.* ¶¶ 18–19.
[11] *Id.* ¶ 13.
[12] *Id.*
[13] *Id.*
[14] *Id.* ¶ 14.
[15] *Id.* ¶ 15.

of HERA and the largest HERA unitholder.[16]  Daugherty resigned from Highland

Capital on September 28, 2011.[17]

The other directors removed Daugherty as a director of HERA on February

16, 2012.[18]  The new HERA board immediately executed a Second Amended and

Restated Agreement (the "2012 Amendment"), which included a new Article XII.[19]

Article XII states that "[i]n the event any Member or holder of units . . . commences

litigation or . . . otherwise initiates any dispute or makes any claim" against HERA

or any member of HERA, including Highland Capital,

> that in any way does or could adversely impact any of the assets held
> by the Company, then with the consent of 75% of the Board, all pending
> and future distributions to the Disputing Party shall be immediately
> suspended and held in escrow by the Company (the "Dispute Escrow")
> until the final, non-appealable resolution of the Dispute.[20]

The new Article XII further provides that the "full costs and expenses" from

any dispute will be deducted from the interests of a HERA member that loses that

dispute.[21]  In addition, the HERA board retains "sole discretion" to retain escrow

funds for "any diminution in value to the assets held by the Company resulting from

---

[16] *Id.* ¶¶ 18–20.
[17] *Id.* ¶ 21.
[18] *Id.* ¶ 22.
[19] *Id.* ¶¶ 22, 24.
[20] *Id.* Ex. C (2012 Amendment) § 12.1.
[21] *Id.* Ex. C (2012 Amendment) § 12.1(A).

5

or in connection with such Dispute" and reallocate those funds pro rata to the other unitholders, even if the disputing member prevails in the controversy.[22]

## 2. The HERA Buyout

After the adoption of the 2012 Amendment, Highland filed suit against Daugherty in Texas, and Daugherty responded with counterclaims (the "Texas Action").[23] During the Texas Action, according to the Plaintiff, Dondero "sought to gain control of Highland Employee Retention Assets by buying its units held by current and former employees of Highland Capital."[24] On January 18, 2013, Highland Capital offered to purchase all the HERA units for 100% of their cash interest value and 60% of their non-cash interest value—except for the units owned by Daugherty.[25] The HERA board transferred its powers to HERA Management on January 17–18, 2013.[26] On January 19, 2013, Highland Capital bought out the HERA board members, who then resigned and left HERA Management as the sole manager of HERA.[27] Highland Capital circulated a formal offer to purchase the units of HERA, except for those owned by Daugherty, on January 31, 2013 until its

---

[22] *Id.* Ex. C (2012 Amendment) § 12.1(B).
[23] *Id.* ¶¶ 25–26.
[24] *Id.* ¶ 27.
[25] *Id.* ¶ 29.
[26] *Id.* ¶ 30.
[27] *Id.* ¶ 31.

expiration on February 15, 2013.[28] HERA Management was formed under Delaware law on February 1, 2013.[29]

HERA Management executed the Third Amended and Restated Agreement of HERA on February 1, 2013 (the "2013 Amendment").[30] The 2013 Amendment eliminated the employee-retention purposes, formerly stated in the LLC Agreement as a reason for HERA's existence and operation,[31] the requirement to make distributions to cover pass-through tax obligations, and members' indemnification rights.[32] That same day, Dondero caused Highland Capital and HERA Management to allocate 93.4% of Highland Capital's legal expenses in the Texas Action as of December 31, 2012, or $1,142,284, to HERA through an Expense Allocation Agreement.[33] On February 7, 2013, Highland Capital offered Daugherty $0 for his interests in HERA because the "costs, expenses, and diminution of the assets" exceeded the value of Daugherty's interests.[34] All other HERA unitholders had

---

[28] *Id.* ¶ 32.
[29] *Id.* ¶ 33.
[30] *Id.* ¶¶ 33, Ex. D (2013 Amendment).
[31] *Id.* Ex. A (HERA LLC Agreement) ("The purpose of the Company shall be to receive and hold assets to be contributed by the Member and to distribute the proceeds of such assets from time to time to certain employees of the Member (or of affiliates of the Member, as applicable) as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing.").
[32] *Id.* ¶¶ 33, Ex. D. (2013 Amendment).
[33] *Id.* ¶¶ 34–35, Ex. E (Expense Allocation Agreement). In contrast, HERA purportedly incurred $154,029 as of December 31, 2012. *Id.* ¶ 35.
[34] *Id.* ¶ 36.

purportedly sold their units to Highland Capital, which according to the Plaintiff, used its own and HERA's funds to purchase the HERA units.[35]

### 3. The Escrow

Dondero, acting for Highland Capital, entered an Assignment Agreement with HERA on April 30, 2013. The Agreement stated that Highland Capital held "the sole economic interest in HERA," and that Highland Capital and HERA "have each determined that it is in their respective best interest" to distribute substantially all the HERA assets, then valued at approximately $9,700,000, to Highland Capital "as an in-kind distribution."[36]

In December 2013, Highland Capital placed Daugherty's HERA interests, valued at $3.1 million, into escrow with the law firm Abrams & Bayliss LLP as escrow agent (the "Escrow").[37] Under the escrow agreement, transfer was only authorized to Daugherty if he prevailed in the Texas Action, and to Highland Capital if his action was dismissed.[38]

### 4. The Texas Action

Dondero testified in the Texas Action regarding the Escrow:

Question: Okay. So -- so if, if Mr. Daugherty somehow prevails in his lawsuit against Patrick Boyce and Lane Britain and [HERA], what happens to Mr. Daugherty's interest that's being escrowed right now with a third-party escrow agent?

---

[35] *Id.* ¶ 37.
[36] *Id.* ¶¶ 38–39, Ex. F (Assignment Agreement).
[37] *Id.* ¶¶ 41, Ex. G (Escrow Agreement).
[38] *Id.* ¶¶ 42, Ex. G (Escrow Agreement) § 3(b)(i).

8

Answer: They go to him.
Question: I'm sorry?
Answer: They go to him via to [sic] [HERA] and then to him.[39]

Dondero also testified that Highland Capital's buyout of the other unitholders in HERA eliminated the retention purpose of HERA.[40]

After a three-week jury trial in the Texas Action, the jury found that Daugherty used Highland Capital's confidential, proprietary, and/or privileged information, and Daugherty was ordered to cease and desist from using that information.[41] The jury also found that Daugherty should pay $2,800,000 in attorneys' fees.[42] Daugherty avers that he later paid that judgment.[43] The jury was instructed to "not consider any actions taken by HERA after February 16, 2012, when the [2012 Amendment] was adopted when determining if HERA failed to comply with the HERA Agreement."[44] The jury found that HERA breached the implied covenant of good faith and fair dealing and awarded $2,600,000 to Daugherty from HERA.[45] The judge then struck a provision of what appears to have

---

[39] *Id.* ¶ 43.
[40] *Id.* ¶ 44 ("Q. So -- why did the escrow agreement not get signed until December of 2013? A. My recollection is as follows: After [HERA] went from being an employee retention program with 30-odd participants clamoring for their money but it all mucked up in litigation, Highland [Capital] wrote a check for $10 million to give those people, in all fairness, liquidity and what they deserved for staying around at Highland [Capital]. Once Highland [Capital] bought out all their units, there were only two unit holders, Highland [Capital] and Pat Daugherty, and *there was no retention purpose left in the vehicle*.").
[41] *Id.* Ex. H (Texas Action Final Judgment) 2.
[42] *Id.* Ex. H (Texas Action Final Judgment) 2.
[43] Dec. 14, 2017 Oral Arg. Tr. 18:11–12.
[44] Joint Appendix ("JA") 75 at 20 (Texas Action jury instructions).
[45] Compl. Ex. H (Texas Action Final Judgment) 3.

9

been a form of order supplied by Highland Capital regarding Daugherty's interest in

HERA[46]:

> It is therefore further ORDERED that Daugherty have and recover $2,600,000 from HERA, ~~representing the full value of Daugherty's interest in HERA as determined by the jury.~~
>
> It is further ORDERED that Daugherty shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed to Daugherty prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury.
>
> It is further ORDERED that total amount of the actual damages rendered against HERA

All parties appealed.[47] HERA represented to the Texas court in September

2014 that "[p]er the Escrow Agreement, if a final, non-appealable judgment against

[HERA] is reached, Abrams & Bayliss, LLP, as Escrow Agent, will transfer the

Deposit Assets to [HERA]."[48] HERA stated that it owed Highland Capital

$7,459,658 for legal expenses but that "$4,904.497 of that liability have been written

off by [Highland Capital] as of December 31, 2013, assuming a lack of collectability

from [HERA]," leaving a $2,555,071 liability in the net worth calculation and

balance sheet.[49] HERA was purportedly insolvent with a negative net worth of

---

[46] *Id.* Ex. H (Texas Action Final Judgment) 3.
[47] *Id.* ¶ 46.
[48] *Id.* Ex. I, Aff. ¶ 7.
[49] *Id.* Ex. I, Aff. ¶ 8.

$2,447,709 as of August 31, 2014.[50] However, this did not include the Escrow, as mentioned in a footnote on HERA's August 31, 2014 balance sheet:

> On July 14, 2014, a court entered a final judgment against HERA, which is currently subject to appeal. The amount specified to compensate Daugherty for these damages was $2,600,000 plus interest. Per the Escrow Agreement dated December 13, 2013 between HCMLP and Abrams & Bayliss, LLP, if a final, non-appealable judgment against HERA is reached, Abrams & Bayliss, LLP as Escrow Agent, will transfer the HERA Deposit Assets to HERA. As such, for bookkeeping purposes, the Deposit Assets as well as the damage award of $2,600,000 plus interest are contingent assets and liabilities, due to the inherent uncertain outcome of a final, non-appealable judgment. Accordingly, neither the asset or [sic] liability is recorded on the balance sheet. In the event of a final, non-appealable judgment against HERA, the Deposit Assets would be recognized by HERA as an asset as would the $2,600,000 liability to Daugherty (or different amount in the event that the final, non-appealable judgment were to differ from the original jury finding).[51]

### 5. The 2016 Escrow Transfer

Nearly three years later, on December 1, 2016, the Texas appellate court affirmed the trial court judgment.[52] Thus, the judgments against Daugherty for $2.8 million (plus interest) in favor of Highland Capital, and against HERA for $2.6 million (plus interest) in favor of Daugherty, became final.[53]

On December 2, 2016, Highland Capital filed for and received a writ of execution for the attorneys' fee award.[54] Abrams & Bayliss resigned as escrow agent

---

[50] *Id.* ¶¶ 48, Ex. I, Aff. ¶¶ 8, Ex. 1.
[51] *Id.* Ex. I, Aff. ¶¶ 8, Ex. 1 n.2.
[52] *Id.* ¶ 49.
[53] *Id.*
[54] *Id.* ¶ 50.

11

that same day but continued to serve as counsel for Highland Capital and its affiliates.[55]

On December 5, 2016, Abrams & Bayliss transferred approximately $3.1 million in Escrow assets to Highland Capital.[56] That same day, Highland Capital filed a judgment lien on Daugherty's home, which is purportedly still in place.[57]

The mandate of the Texas appellate court was filed with the trial court in the Texas Action, finalizing the judgment on December 8, 2016.[58] Also on December 8, 2016, Highland Capital sought a writ of garnishment in the Texas Action to seize HERA assets owed to Daugherty because, according to an affidavit filed by Highland Capital's general counsel, Daugherty had no other way to pay Highland Capital's attorneys' fees.[59] The writ of execution returned unexercised because Daugherty was in New York on business.[60]

On December 9, 2016, Highland Capital requested and received a second writ of execution.[61] Also on December 9, 2016, Highland Capital filed an application of turnover to transfer Daugherty's interest in NexBank Capital, Inc. and Trussway

---

[55] *Id.* ¶ 51.
[56] *Id.* ¶ 52.
[57] *Id.* ¶ 53.
[58] *Id.* ¶ 54.
[59] *Id.* ¶ 55.
[60] *Id.* ¶ 56.
[61] *Id.* ¶ 57.

Holdings, Inc. to Highland Capital.[62]    Both entities are involved in other actions

pending in this Court and are controlled by Dondero, Okada, and Highland Capital.[63]

Daugherty wired approximately $3.2 million in cash to Highland Capital on

December 14, 2016 to satisfy the award of attorneys' fees in the Texas Action.[64]

Daugherty then contacted Abrams & Bayliss regarding the Escrow.[65]   Abrams &

Bayliss responded on February 16, 2017:

> By letter dated December 2, 2016, Abrams & Bayliss notified Highland that it was resigning as Escrow Agent pursuant to Paragraph 5 of the Escrow Agreement.  By letter dated December 2, 2016, Highland informed Abrams & Bayliss that it was (i) accepting Abrams & Bayliss' resignation as Escrow Agent, (ii) waiving the ten-day notice period under Paragraph 5 of the Escrow Agreement, and (iii) directing Abrams & Bayliss to return the Deposit Assets to Highland in accordance with the instructions provided in the letter.
>
> On December 3, 2016, Abrams & Bayliss informed Highland in writing that it agreed to the waiver of the notice period, such that Abrams & Bayliss' resignation was effective immediately.  On December 5, 2016, Abrams & Bayliss returned the Deposit Assets to Highland in accordance with the December 2, 2016 instructions.   Accordingly, Abrams & Bayliss no longer serves as Escrow Agent or holds Deposit Assets.[66]

HERA now claims to be insolvent and Daugherty seeks to collect his judgment

against HERA.[67]

---

[62] *Id.* ¶ 58.
[63] *Id.*; *see Hoyd v. Trussway Holdings, LLC*, Del. Ch., C.A. No. 2017-0260-SG; *Daugherty v. NexBank Capital, Inc.*, Del. Ch., C.A. No. 2017-0382-SG.
[64] Compl. ¶ 59.
[65] *Id.* ¶ 60.
[66] *Id.* Ex. J (Abrams & Bayliss Letter).
[67] *Id.* ¶ 62.

13

*C. Procedural History*

The Plaintiff filed the Complaint on July 6, 2017. The Defendants filed a Motion to Dismiss on August 23, 2017, and I heard oral argument on that Motion on December 14, 2017. The parties then submitted supplemental briefing regarding the Texas Action.

The Complaint contains seven counts. Count One alleges that the Defendants caused a fraudulent transfer to allow HERA to evade Daugherty's judgment in the Texas Action.[68] Count Two seeks judicial dissolution of HERA and distribution of the HERA assets to Daugherty, because HERA can "no longer fulfill its original limited purpose, the retention of Highland Capital employees."[69] Count Three alleges breach of fiduciary duties against Dondero and HERA Management, both directly and derivatively on behalf of HERA, in the adoption of the 2013 Amendment, the Expense Allocation Agreement, and the Assignment Agreement.[70] Count Four alleges, directly and derivatively, that Highland Capital aided and abetted breaches of fiduciary duty by Dondero and HERA Management in the drafting of the 2013 Amendment and the receipt by Highland Capital of the Escrow assets under that Amendment.[71] Count Five alleges a breach of the implied covenant

---

[68] *Id.* ¶¶ 73–81.
[69] *Id.* ¶¶ 82–89.
[70] *Id.* ¶¶ 90–99.
[71] *Id.* ¶¶ 100–07.

14

of good faith and faith dealing against HERA Management and Dondero in adopting the 2013 Amendment and entering into the Expense Allocation Agreement and the Assignment Agreement.[72] Counts Six and Seven are claims for indemnification (and fees on fees) against Highland Capital.[73]

By Letter Opinion of January 16, 2018, I denied the Motion to Dismiss Count One because I found that "there is a factual issue about whether HERA had a cognizable interest in the amount in escrow."[74] I noted that "it is reasonably conceivable that HERA owned the amount in escrow once the Plaintiff's judgment against HERA became final; and that Highland caused HERA's escrowed asset to be transferred to Highland without value, leaving HERA insolvent, to defeat the Plaintiff as a creditor of HERA."[75] However, I granted the Motion to Dismiss Count One for Dondero because, even if I assume that HERA Management is the alter ego of Dondero, nothing in Count One indicates that HERA Management "took any act with respect to removing the escrowed amount from HERA."[76] What follows is my decision regarding the Motion to Dismiss the balance of the Complaint.

---

[72] *Id.* ¶¶ 108–13.
[73] *Id.* ¶¶ 114–19.
[74] *Daugherty v. Highland Capital Mgmt.*, 2018 WL 417270, at *2 (Del. Ch. Jan. 16, 2018).
[75] *Id.*
[76] *Id.* at *3.

## II. ANALYSIS

The Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6). When reviewing such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[77]

I need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[78]

In briefing, and at oral argument, the parties hotly contested the application of issue and claim preclusion, arising from the Texas Action, to the Complaint here. This appeared to me to be the most pertinent of the issues on the Motion to Dismiss. Accordingly, I suggested, in the rather imperious way judges have of suggesting, supplemental briefing on the precise nature of the issues raised in the Lone Star state. The parties complied with vigor and exactitude. As Burns observed, however, the best laid schemes gang aft a-gley. On review, I find that I need not reach issue or claim preclusion, because those portions of the Complaint arising from the 2013 Amendment and contemporaneous actions are barred by laches.

---

[77] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations and internal quotation marks omitted).

[78] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

*A. Laches*

The Motion to Dismiss Counts Two through Five on grounds of laches is granted.

Laches is an equitable defense designed to ensure that equity aids the vigilant, and not the dilatory.[79] The purpose for employing laches is partially similar to the purpose for respecting a limitations period at law: memories grow stale with time, evidence becomes lost, and individuals and entities are entitled to defend against claims in a reasonable amount of time, or not at all.  Unlike a statute of limitations, which provides a time bar set out in a legal code, laches is a creature of equity.  It is more flexible than a statute of limitations or repose, and focuses on a balancing of equities as well as the passage of time.  Its application rests on the reasonableness of the delay, and any resulting prejudice.  Nonetheless, where, as here, a claim is brought in Chancery that would be barred by a statutory limitation if brought at law, the same claim will be barred here by analogy to the statute, absent "extraordinary circumstances."[80]  "The Court does not need to engage in a traditional laches analysis for a presumptively late complaint."[81]  For claims sounding in contract, an action "must be brought within three years from the date that the cause of action accrued."[82]

---

[79] *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177 (Del. 2011) (citing *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).
[80] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).
[81] *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013).
[82] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 768 (Del. 2013); 10 *Del. C.* § 8106.

"It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty."[83]

There are exceptions. First, "if unusual conditions or extraordinary circumstances make it inequitable" to bar a suit by laches, the court "will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it."[84] While "[t]here is no precise definition of what constitutes unusual conditions or extraordinary circumstances," the court "must exercise its discretion, after considering all relevant facts," including:

> (1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; (2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether the delay in filing suit was attributable to a legal determination in another jurisdiction; (4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and (5) whether, at the time this litigation was filed, there was a bona fide dispute as to the validity of the claim.[85]

The Supreme Court interprets a "bona fide dispute" to mean that the claim would survive a motion to dismiss or, in other words, is not futile.[86]

---

[83] *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998).
[84] *IAC*, 26 A.3d at 177–78.
[85] *Id.* at 174, 178.
[86] *Levey*, 76 A.3d at 771–72 ("The fifth and final *IAC* inquiry is whether there is a 'bona fide dispute' as to the validity of Levey's claim in Delaware. The Court of Chancery so held, and we agree. The Vice Chancellor held that 'in terms of surviving a motion to dismiss, I think [Levey's] claim certainly would' . . . . The trial court's determination establishes that there is a 'bona fide dispute' over the validity of Levey's claim, and that the fifth *IAC* factor is satisfied.").

Second, the court may apply the principle of equitable tolling when a "plaintiff ha[s] previously brought the claim in a different state court."[87]  This is because:

> [A]llowing a plaintiff to bring his case to a full resolution in one forum before starting the clock on his time to file in this State will discourage placeholder suits, thereby furthering judicial economy.  Prosecuting separate, concurrent lawsuits in two jurisdictions is wasteful and inefficient . . . .  The prejudice to defendants is slight because in most cases, a defendant will be on notice that the plaintiff intends to press his claims.[88]

I first analyze whether the Defendants can establish the elements of a laches defense from the face of the Complaint, then consider whether the Plaintiff can point to facts to avoid this defense under the plaintiff-friendly standard of review at this stage.

### 1. The Defendants Establish that Laches Applies

I find that the Defendants establish the elements for a laches defense for those claims which arise from or depend upon the agreements entered into in 2013.[89] Because this is a presumptively late complaint, I need not engage in a traditional laches analysis.[90]  In any event, I find that the Plaintiff's delay in filing suit in Delaware is unreasonable.  After the Plaintiff's fourth amended complaint in the Texas Action—which arguably attempted to assert the claims at issue here—was

---

[87] *Id.* at 772.
[88] *Reid*, 970 A.2d at 181–82.
[89] Laches cannot apply to claims that arose from events in 2016 because these are still within the allowable three-year time period.
[90] *See de Adler*, 2013 WL 5874645, at *12.

19

denied in 2013, the Plaintiff did not file in Delaware until July 2017. According to the Plaintiff, "[u]ntil the Texas Action was resolved, Daugherty's status as a member of [HERA] was unknown," so the Defendants would presumably (per Daugherty) have sought a stay in Delaware if Daugherty brought suit while the Texas Action was under appeal.[91] However, the Texas appellate court specifically noted that "the question of ownership of the units was not resolved by the jury."[92] That is because "[w]hether HERA's conduct constituted a breach of the agreement is not the same question as whether or not Daugherty own[ed] HERA units."[93] Daugherty's status as a member of HERA was not at issue in the Texas Action. Daugherty, at the very least, could have pursued this action, concerning the 2013 Amendment and contemporaneous actions, here after the Texas trial court denied his motion to amend the fourth amended complaint, on December 9, 2013. There was no compelling reason to await the final resolution of the Texas appeal. Daugherty's delay of approximately four years before commencing this action is unreasonable, as well as out of compliance with the applicable limitations period at law.

---

[91] Daugherty's Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Answering Br.") 40.
[92] *Daugherty v. Highland Capital Mgmt., L.P.*, 2016 WL 4446158, at *18 (Tex. App. Aug. 22, 2016).
[93] *Id.*

2. <u>The Exceptions to Laches Do Not Apply</u>

Notwithstanding the analysis above, Daugherty contends that "unusual conditions or extraordinary circumstances" exist to avoid application of laches. Daugherty relies on *IAC*[94] and *Levey*[95] in support of his argument that these facts qualify as "unusual conditions or extraordinary circumstances."[96]

In *IAC*, a former executive timely filed an action against a corporate defendant ("Corporation A") in Florida and defended himself against claims by Corporation A in an arbitration proceeding.[97] Corporation B "controlled [Corporation A's] defense" of the litigation "from the time it was filed" and was "ultimately responsible for any award," "describ[ing] itself as the real party in interest."[98] When the arbitration panel found for the plaintiff and a non-Delaware court granted a judgment in the plaintiff's favor, Corporation A filed for bankruptcy.[99] The plaintiff then sued Corporation B in Delaware.

The Court of Chancery allowed the plaintiff's claim to proceed despite the statute of limitations due to exceptional circumstances, and the defendants appealed.[100] The Supreme Court held that "[t]his combination of factors [was]

---

[94] *IAC*, 26 A.3d at 179.
[95] *Levey*, 76 A.3d at 769–70.
[96] *IAC*, 26 A.3d at 177–78.
[97] *Id.* at 176.
[98] *Id.* at 176–78.
[99] *Id.* at 176.
[100] *Id.* at 177.

highly unusual" and laches should not bar the suit, although the former CEO knew he had a claim against the controller, because "he did not know, and there is no evidence that he had reason to suspect, that [the acquirer] would be unable to pay."[101] The former CEO otherwise acted promptly by seeking advancement and indemnification in the arbitration and Florida proceedings and the Florida courts held that his claims were meritorious.[102] In addition, the former CEO could not have filed a "placeholder suit" in Delaware in good faith while the Florida action was under appeal.[103] Indeed, "[t]o disregard this important factor would glorify form over substance."[104] To avoid leaving the blameless winning litigant without remedy, equity allowed the suit to proceed.

In *Levey*, the Supreme Court held that "unusual conditions or extraordinary circumstances" prevented the application of laches when a non-Delaware court sent a counterclaim to arbitration and the arbitration panel later disclaimed jurisdiction.[105] Despite waiting more than two years after the arbitration panel's rejection of jurisdiction to file in Delaware, the delay was "attributable, at least in part, to the defendants having sued [the plaintiff] in the [state] action, and also to that court's mandatory arbitration ruling—distinct from any inaction by [the plaintiff]."[106] The

---

[101] *Id.* at 179.
[102] *Id.* at 178–79.
[103] *Id.* at 178.
[104] *Id.*
[105] *Levey*, 76 A.3d at 771.
[106] *Id.*

defendants had sufficient notice of the suit and participated in previous proceedings.[107] The Court of Chancery found "plenty of indicia" that the plaintiff was "treated unjustly" and, in a bench ruling, expressed regret that it was required to bar the claim on laches grounds.[108] The Supreme Court reversed, holding that "unusual conditions or extraordinary circumstances" prevented the application of laches under these facts.[109] In *Levey*, I note, the same claim that the plaintiff ultimately brought in Chancery was identical to one delayed by improvident reference to arbitration.

In light of this case law, I examine the facts before me. The factors in *IAC* are pertinent to consider in the application of the laches doctrine. First, Daugherty did not pursue his claims that arose from the Defendants' actions in 2013, through litigation or otherwise, before the statute of limitations expired, except through his attempt to amend his complaint in the Texas Action. That action was already pending when Defendants' 2013 actions took place. Daugherty attempted to pursue these claims in the then-pending action; the trial court denied his motion to so amend his complaint on December 9, 2013.[110] A three-week trial was held in January

---

[107] *Id.*

[108] *Id.* at 773–74.

[109] *Id.* at 774.

[110] Defs.' Opening Br. Ex. H (Tex. Order Denying Daugherty's Mot. for Leave to File Fourth Am. Countercl. & Third-Party Pet'n) 2. I find that the court documents from the Texas Action are incorporated into the Complaint.

2014.[111]  The judge charged the jury to ignore facts arising after February 16, 2012.[112]  Unlike the plaintiffs in *IAC* and *Levey*, Daugherty knew that his claims regarding the 2013 agreements were not under adjudication in the Texas Action. Second, the delay in filing suit was not attributable to a material and unforeseeable change in the parties' personal or financial circumstances.  Third, the delay in filing was not attributable to a legal determination in another jurisdiction; as mentioned above, Daugherty's status as a member of HERA was not at issue.  Fourth, the Defendants were aware of and participated in prior proceedings, which tilts in Daugherty's favor.  Fifth, I find that, after drawing the necessary inferences at this stage, Daugherty could conceivably recover based on the facts alleged in the Complaint, but only to the extent his claims do not rely on allegations decided against him in the Texas Action.  These claims qualify as bona fide disputes, therefore, and this factor leans mildly in favor of Daugherty's purpose here.[113]  In summary, the majority of *IAC* factors indicate that the "unusual conditions or extraordinary circumstances" exception should not apply.

---

[111] Compl. ¶¶ 44–45.

[112] Opp'n to Supp. Mem.; JA 75 at 20 (Texas Action jury instructions).

[113] *See BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530, at *12 (Del. Ch. Nov. 2, 2017) ("The mere existence of a bona fide dispute at the time the suit was filed does not justify a finding of extraordinary circumstances when the weight of the other factors cuts against such a finding.").  Conceptually, the *IAC* factors are perhaps better applied by asking whether the presumptively time-barred action is frivolous (*IAC* factor five).  If not, any extraordinary circumstances (*IAC* factors one through four) come into consideration.

24

*IAC* and *Levey*, in my view, are distinguishable. Unlike the plaintiff in *IAC*, who acted promptly in seeking to vindicate his claims in both arbitration and state court, Daugherty chose to wait more than three years to bring suit regarding actions taken in 2013. In *IAC*, the underlying claims, tied up in arbitration and then frustrated by bankruptcy after a non-Delaware judgment, were the same as those brought in Delaware; here, Daugherty brings *different* claims than those decided in the Texas Action. In *Levey*, the counterclaim plaintiff waited nearly two years before filing but was stalled for a year due to a mandatory arbitration proceeding outside of the counterclaim plaintiff's control. Here, Daugherty had full control of his claims arising from the 2013 actions throughout the entire period. Further, the Court of Chancery found "plenty of indicia" that the plaintiff in *Levey* was "treated unjustly," circumstances, I find, absent here. Daugherty's delay in bringing these claims is unreasonable.

Second, Daugherty contends that "the limitations period for Daugherty's claims was equitably tolled during the Texas Action" because "Daugherty unsuccessfully attempted to bring substantially identical claims in the Texas Action through his proposed fourth amended counterclaim."[114] Elsewhere, however, Daugherty contends that "the 2013 transactions were separate and distinct from the illegal adoption of Section 12.1 in 2012, which was at issue in Texas. The

---

[114] Answering Br. 41–42.

transactions challenged here occurred *after* the Texas Action was filed, occurred *a year after* the 2012 Agreement, and were adopted by *different managers* of HERA."[115]  In *Levey*, the "undisputed facts establish[ed] that [the plaintiff] timely and consistently asserted his claim in two, non-Delaware, fora within the analogous limitations period, and that his delay in filing suit in Delaware was attributable partially—but not entirely—to extraneous factors other than his own inaction," including an erroneous order for mandatory arbitration.[116]  Equitable tolling, in *Levey*, brought the action *within* the legal limitations period.  Here, the Texas trial court denied Daugherty's motion to amend the complaint to add these claims on December 9, 2013.  Assuming the claims were equitably tolled until that time, he could have brought those claims here within three years following that date.  Daugherty chose otherwise.  Daugherty was not limited by extraneous factors such as those faced in *Levey*, and equitable tolling is inapplicable here.

### 3. The Application of Laches

Counts Three, Four, and Five arise from wrongs that occurred, allegedly, in 2013.  I adopt the statute of limitations by analogy.  Because laches applies to claims arising from actions in 2013, and this suit was filed on July 6, 2017, the Defendants' Motion to Dismiss Counts Three through Five is granted.

---

[115] Pl.'s Opp'n to Supp. Mem. 6 (internal citations omitted).
[116] *Levey*, 76 A.3d at 772–73.

Count Two is also dismissed. Daugherty seeks the dissolution of HERA under Section 18-802 of the LLC Act in Count Two because there "are no more unit holder-employees eligible for deferred compensation" and so "it is not reasonably practicable to carry on the business in conformity with the limited liability company agreement."[117] However, the 2013 Amendment changed the purpose of HERA to "do all such things for which limited liability companies may be formed."[118] Daugherty does not allege that HERA cannot achieve its purpose as set out under the 2013 Amendment, but instead that the purpose as provided in the superseded 2012 Amendment is frustrated. Consequently, Claim Two requires that I find the 2013 Amendment to be invalid.[119] Because Daugherty's suit regarding the 2013 Amendment is barred by laches, Count Two must also be dismissed.

Counts Six and Seven, for indemnification, and for fees incurred in securing any indemnification amount, are not barred by laches. "A cause of action for indemnification accrues when the officer or director entitled to indemnification can 'be confident any claim against him . . . has been resolved with certainty.'"[120] Such

---

[117] Compl. ¶¶ 86–87, 44 (Dondero testified in Texas that "[o]nce Highland [Capital] bought out all their units, there were only two unit holders, Highland [Capital] and Pat Daugherty, and there was no retention purpose left in the [HERA] vehicle" (emphasis omitted)).

[118] Answering Br. 43–44.

[119] Compl. ¶ 88 ("To the extent Dondero purported to change the purpose of Highland Employee Retention Assets in February 2013, that amendment should be invalided and ignored because it was self-dealing and a breach of fiduciary duty or the implied covenant of good faith and fair dealing.").

[120] *Scharf v. Edgcomb Corp.*, 864 A.2d 909, 919 (Del. 2004) (quoting *Scharf v. Edgcomb Corp.*, 1997 WL 762656, at *4 (Del. Ch. Dec. 4, 1997)).

"certainty" requires the resolution of any appellate review.[121] As a general matter, adjudicating indemnification claims piecemeal is highly inefficient,[122] and I find the accrual date for laches purposes was the date the Texas matter became final, after which Daugherty acted promptly. The Defendants argue that the indemnification claim accrued as each dollar of expense was incurred; application of laches under such a rule would be highly problematic. The Texas appellate court decision did not become final until December 1, 2016. For statute of limitations and laches purposes, the clock began to run at that point. The Motion to Dismiss Counts Six and Seven on laches grounds is denied.

*B. Indemnification*

In addition to laches, the Defendants seek to dismiss the indemnification claims for failure to plead a cognizable claim. At this stage, the Defendants are entitled to dismissal only if the Plaintiff "would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[123] The Defendants argue that the indemnification claims are related to litigation of "Daugherty's personal contractual obligations, as opposed to acts performed in the name of Highland [Capital]," and thus, under the applicable contracts, no

---

[121] *Id.* at 920.
[122] *Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 403 (Del. Ch. 2008) ("The adjudication of [indemnification] issues on a stage-by-stage basis would be astoundingly wasteful and a clear signal of design failure.").
[123] *Savor, Inc.*, 812 A.2d at 897 (internal citations omitted).

indemnification right accrued in the litigation of these claims in Texas.[124]  I find that, at this pleading stage, it is reasonably conceivable that Daugherty was acting in his position as an employee of Highland Capital with respect to at least some of the claims he defended in Texas.  Consequently, this matter involves a question of fact, and must be addressed on a more complete record.

### III. CONCLUSION

For the reasons given above, the Motion to Dismiss Counts Two through Five is granted.  The Motion to Dismiss Counts Six and Seven is denied.  The parties should submit an appropriate form of order.

---

[124] Mot. to Dismiss Verified Compl. 6.